# City of Franklin v. St. Mary's Roman Catholic Church.

(Decided May 14, 1920.)

## Appeal from Simpson Circuit Court.

1. Adverse Possession—Sufficiency and Requisites of—Cemeteries.— Where a city purchased cemetery grounds and set apart a certain portion for the use of the Catholics, the remainder for Protestants, and the Catholics took possession of their part and exercised for forty years, with the knowledge of the city, every act of ownership that the conditions of its use would permit, they were entitled to hold it by adverse possession, although the land had never been conveyed to the church, nor did the Council take any action towards setting it apart to the Catholics.

2. Adverse Possession—Speeches of Adverse Holder Asserting Claim Not Essential—Acts and Conduct Control.—An adverse claimant in the actual possession of land need not, in order to perfect his adverse holding, give it out in public speeches that he is asserting title to the land. The doctrine of adverse possession rests on the acts and conduct of the claimant and not on his talk, although his statements are competent evidence.

3. Adverse Possession—When Adverse Holder Not Confined to Portion in Actual Use.—When a party becomes entitled by adverse possession to the whole of a described body of land, although he is only actually using or cultivating a small part thereof, he will be entitled to the whole.

4. Easements—Meaning of Word.—In order to constitute an easement, there must be two distinct estates, a dominant, to which the right belongs, and the servient, upon which the obligation rests. An easement is a right in the lands of another and cannot exist in favor of a person in lands which he himself owns. The same person cannot at the same time have the fee simple title to land and an easement of any sort or character therein.

5. Easements—Construction of Easements—Statutes—Limitation of Actions—Construction of Section 2546, of the Kentucky Statutes. —The provision in this section that the statute of limitation shall not begin to run against a city or town in respect to actions for the recovery of any street, alley or public easement has no application to a state of case where the city or town owns the fee simple title. Its application must be confined to easements, as we have defined them.

J. S. MILLIKEN, SIMS, RODES & SIMS for appellant.

G. C. HARRIS, G. T. FINN, WHITESIDES & BRADSHAW and LAWRENCE B. FINN for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE CARROLL— Affirming.

In 1870 the city of Franklin, then in the fifth class, purchased and paid for about twenty acres of land to be used for cemetery purposes, the fee simple title being conveyed to it.

In 1918, the St. Mary's Roman Catholic Church, in connection with other appropriate officials of the Catholic church, brought this suit in equity against the city of Franklin, alleging that when the land for cemetery purposes was purchased, the city set apart for the use and benefit of the Catholic church, about six acres, situated on the northern boundary and extending entirely across it; that since that time it had been in the actual, open, continuous and exclusive possession of this six acres, to a well defined boundary, holding, using and claiming it adversely to the city and everyone else; that the city had, shortly before the institution of the suit, and was at the time it was brought, asserting title to this land and interfering with the control and possession exercised over it by the church. It asks that its title be quieted and that it be adjudged the owner in fee of the land.

The city, in its answer, after denying certain material averments in the petition, set up that the use of this six acres by the Catholics was purely permissive on the part of the city; that there had never been any adverse holding; that it was the owner of and entitled to exercise control over this piece of land, subject to the right of the Catholic church to such parts of it as were needed for the purpose of a burial place for its dead.

It further relied on section 2546, of the Kentucky Statutes, providing in part that the statute of limitation "shall not begin to run in respect to actions by any town or city for the recovery of any street, alley or other public easement, or any part of either or the use thereof in such town or city, until the trustees, or the council or the corporation, by whatever name known or called have been notified in writing by the party in possession, or about to take possession, to the effect that such possession will be adverse to the right or title of such town or city. Until such notice is given, all possession of streets, alleys and public easements, or any part of either, in any town or city, shall be deemed amicable, and the person in possession the tenant at will of such town or city;" and averred that the Catholic church had not at any time notified it in writing that its use, holding or possession of this piece of land was or would be adverse

to the right or title of the city and, therefore, the church could not rely on its use or possession of the land to make out its claim of adverse holding or to defeat the title of the city.

Other pleadings made up the issues and when the case was submitted, after the evidence had been taken, the lower court adjudged that the "city of Franklin has no interest, right, title or claim to the lot of land used as a cemetery by the plaintiffs herein, and it is further adjudged that the absolute fee simple title to said lot is in the plaintiffs."

On the record, as it comes here, two questions are presented: First, was the holding of this piece of land by the Catholic church adverse or permissive? and, second, is section 2546 of the statutes applicable?

On the question of adverse holding, the church introduced a number of witnesses, the substance of their evidence being as follows:

Brady Perdue testified that the Catholic portion of the cemetery was separated from the remainder of it by a road or driveway, extending entirely across the cemetery from east to west; James W. Bradshaw that stones had been placed at the western and eastern ends of the boundary claimed by the Catholics, marking the separation of this land from the remainder of the cemetery; John B. Finn that the driveway and these stones had been there for many years; that the Catholic church had been in possession of the land north of the road or driveway for at least forty years; Joe Jordon that he served as a member of the city council for about six years (some ten years before the suit was brought) and was a member of the cemetery committee; that it was understood there was a line between that part of the cemetery grounds owned by the city and by the Catholics, and that the cemetery committee instructed the sexton that he would have supervision of all the cemetery except the Catholic portion, and told him that if he did any work in that portion of the cemetery he must get his instruction from some other person; that the city paupers were buried in that portion of the cemetery controlled by the city. Vincent Lewis said that in 1878, he purchased a burial lot in the Catholic part of the cemetery and paid for it $30.00 to the parish priest, who gave him a receipt that took the place of a deed.

In this connection, it may be said that there is filed with the record a book of blank receipts that when filled out by the priest in charge were given by him to Catholics who purchased lots in the Catholic part of the cemetery. This book shows that lots were sold and receipts issued beginning in February, 1873, and extending down to 1916. The blank receipts now in the book read as follows: "Franklin, Ky.,_____18_____. Received of _____ $_____, which entitled_____ _____to this certificate of ownership of lot No._____, block_____ in the St. Mary's Catholic cemetery containing _____square feet. _____Pastor."

The stubs, except such as are filled out, read: "Date _____, Name_____, Block_____ _____, Lot No._____, Price $_____." There are in this book a number of stubs from which the receipts were cut off when delivered to purchasers of lots, and examples of these stubs are "Date February 19th, 1873; Name Patrick Burke; Block B; Lot No. 3; Price $20.00." "Date July 3, 1916; Name Johns & Jennett; Block C; Lot No. 9; Price $50.00."

George C. Harris said that when the city purchased this cemetery ground, that portion set apart to the Catholics was surveyed, but he was not present when the survey was made; that he was city attorney of Franklin some years before he testified, and that he never heard any officers of the city or anyone else making claim to that part of the cemetery understood to have been set apart for the use of the Catholics; that there was never any controversy about it.

T. J. Reese said that beginning in 1906, he was superintendent of the cemetery under appointment of the city council; that it was part of his duties to look after the cemetery, keep it in order, sell lots and dig graves; that whenever any person came to him to buy lots in the Catholic part, he would send them to Mrs. Larue, who was a Catholic; that when lots were sold in the portion of the cemetery that he had control of he collected the money and paid it to the town, but did not collect any money for lots in the Catholic part; that he got $3.00 for digging graves in the city part of the cemetery, and paid to the city $1.00, keeping $2.00 for himself; that when he dug graves in the Catholic portion he charged $3.00 and kept it, not turning any part of it over to the city. Mike Link and Clarence Kirby, other superintendents, gave evidence to the same effect.

J. Larue said that a part of the Catholic portion had been rented out by the Catholics for about fifteen years, at different times, for the purpose of keeping it clean of weeds and brush.  W. R. Bryan said that about 1913, he applied to the city authorities for a permit to bury Mrs. Bryan in the Catholic cemetery, and was told that the city had nothing to do with that part of the cemetery and he got the permit from Mrs. Larue.

G. W. Whitesides said he had been city attorney of Franklin and during the years he held this office he never heard of the city by any of its officers making any claim to the Catholic portion of the cemetery; that it was regarded by everybody as being under the control of the Catholics.  John Kohlpepp was mayor of Franklin in 1883-84, and he never heard any question raised about the right of the Catholics to that portion of the cemetery now claimed by them.  J. H. Covington, who was also mayor of the city from 1906 to 1910, gave evidence to the same effect.

On behalf of the city, E. L. Gillespie said that he had never heard the Catholics asserting title to this land until this controversy came up; that there were not many Catholics in Franklin and Simpson county; that the space occupied by lots in which Catholics were buried was less than an acre; that considering the few Catholics in the community, they had no need and never would have for the six acres, or as much as two acres; that the Protestant part of it had filled up and it would soon be necessary to secure other ground for burial purposes.

There was also evidence in behalf of the city that the road or driveway between the Protestant and Catholic portions of the cemetery was a part of the system of driveways in the cemetery and that it was not laid out for the purpose of marking a division line between the Catholic and Protestant parts of the cemetery; also to the effect that the stones spoken of by witnesses in behalf of the church and said to be located on the southern boundary of the Catholic portion were not in fact at the places testified to, nor were they, if at these places, put there with any intention or purpose of marking or indicating a boundary to be owned by the Catholics.

There is also much evidence by Mitchell, Booker, McClanahan, Knapp and others to the effect that they had never heard, until shortly before the suit was brought, any assertion by the Catholics or any of them of a claim of ownership or title to this land in controversy, al-

though all of them agree that no Protestants, except pos-
sibly one whose religion there was some dispute about,
were ever buried in the Catholic grounds, or any Catho-
lics in the Protestant grounds.

Summing up the evidence, we think the weight of it
conduces to show, (1) that soon after the cemetery
grounds were purchased by the city, there was set apart
about six acres for the use of the Catholics, the balance
of it to be used by Protestants; (2) that no Protestants
were buried in the Catholic portion or Catholics in the
Protestant portion; (3) that the space now occupied in
the Catholic portion by burial lots embraces less than an
acre, and that not as much as two acres will ever be
needed for the burial of Catholics, while the Protestant
part of the cemetery is nearly filled up; (4) that the city
officials and the public generally always recognized that
part of the ground set apart for the Catholics as the
Catholic part of the cemetery, and that portion set apart
for Protestants as the Protestant part of the cemetery;
(5) that there was never any controversy or dispute
about this, or indeed anything said about it until shortly
before this suit was brought; (6) that the superintend-
ents of the cemetery took care of, and sold lots, and dug
graves in the Protestant part of the cemetery and paid
the receipts to the city, while the lots in the Catho-
lic part of the cemetery were sold by the church author-
ities and the money paid to them; (7) that at different
times the Catholics rented that portion of the cemetery
claimed by them not used for burial purposes; (8) that
the city sold lots in the Protestant part of the cemetery
and conveyed them to purchasers and the church pur-
sued the same course as to lots in its part.

It is true that no deed was ever made by the city to
the Catholic church conveying to it this land, nor is there
any record that the council took any action towards set-
ting apart to the Catholics any part of this ground in
dispute, but there is ample evidence to show that the
Catholics continually, openly and with the actual knowl-
edge of the city exercised over this ground every act of
ownership that the conditions of its use would permit.

It does not appear, however, that in speeches or talk,
the Catholic church by any of its members, asserted title
to the land in controversy. But an adverse claimant in
the actual possession of land need not, in order to per-
fect his adverse holding, give it out in public speeches

that he claims the land or is asserting title to it, because the doctrine of adverse possession rests on the acts and conduct of the claimant and not on his talk, although it would, of course, be competent to show that the adverse claimant had by speeches asserted claim to the land.

We also think that if the owner of land sets it apart for the use and occupancy of another in the manner and for the purposes here shown and authorizes or permits him to enter upon it and take actual possession of and exercise actual ownership and control over it, in the open and public manner in which the Catholics have exercised ownership and control over this piece of ground for forty years, this will give to such person the right to hold the same under the doctrine of adverse possession.

It is, however, insisted that the land the Catholics are entitled to, if any, should be confined to so much of the ground as is now occupied by burial lots and so much as will be necessary in the future; and if this rule should be applied, the Catholics should only be adjudged entitled to not exceeding two acres, as it is made plain by the record that this much ground is more than in all human probability will ever be needed as a burial place for the Catholics.

There is a line of cases relied on by counsel holding that where an easement for a certain purpose is acquired, the owner of the easement will be confined to so much of the land as may be needed for the purposes for which it was acquired, but this doctrine is not applicable here, because the whole of this ground and not a mere easement therein was set apart and dedicated for a particular use.

And when a party becomes entitled by adverse possession to hold the whole of a described body of land, only a small part of which he is actually using or cultivating, we know of no authority that will warrant the courts in taking from him a part of the whole merely because he has not put such part to any actual use in connection with his occupancy.

It would be a generous and neighborly act if the Catholic church should voluntarily restore to the city such part of this six acres as is not now and will never in the ordinary course of events be needed by the church as a place of burial for its dead, but this is a matter that the church must determine for itself, as we have no right

or authority to adjudge that it shall surrender any part of it.

Coming now to consider the application of section 2546, it will be observed that it provides that the statute of limitation shall not begin to run against a town or city in respect to actions for the recovery "of any street, alley or other public easement or any part of either, or the use thereof;" so that the precise question is, does this cemetery fall within the definition of an "easement?"

The word "easement" is a fixture in the law; it had its origin in the earliest recorded history of jurisprudence, and in these succeeding years, although the subject has been treated in many text books and by innumerable court decisions, there has been remarkable unanimity in the definition of the word. It is settled without conflict or inconsistency by all the authorities that the same person cannot, at the same time, have the fee simple title to land and also an easement of any sort or character therein, and this for the simple reason that the fee simple title carries with it all right, title and interest of every nature and description to the whole of the land.

It is equally as thoroughly established that when the owner of an easement acquires the fee simple title to the land in which he had the easement, the easement is thereby extinguished; also that an easement consists of the right of one person to use in some manner the land owned by another person. Or as said in Washburne on Easement and Servitude, page 3, "there must be two distinct tenements,—the dominant, to which the right belongs, and the servient upon which the obligation rests."

In 10 Am. & Eng. Enc. of Law, there may be found this brief, yet admirable, statement that "an easement is a right in the lands of another and cannot exist in favor of a person in lands which he himself owns." To the same effect Kent's Commentary, vol. 3, page 448; 14 Cyc. 1139; Bouvier's Law Dictionary and Webster's Dictionary.

Further citation of authority is unnecessary, because, as we have said, the definition of an easement, as we have stated it, is elementary and consistent.

It is however insisted by counsel for the city that the reason and spirit of the statute was to protect all pub-

lic property held by municipal corporations from claim-
ants by adverse possession unless they had given the re-
quired notice regardless of whether the municipality
had the absolute title or merely an easement in or the
right to use the property in question.

There would be great force in this argument if the
framers of the statute in place of the word "easement"
had used the word "property." If the statute had read
that an action should not begin to run in respect to "any
street, alley or other public property, or any part of
either, or the use thereof;" it would have been
broad enough to embrace any public property to which
the city or town had a title in fee or an easement there-
in; but the makers of the statute used the word "ease-
ment," and the meaning of this word, at the time the
statute was written in 1873, was so well known that we
must assume the legislature used it advisedly and in-
tended by its use to limit the application of the statute
to streets, alleys and public easements.

In some jurisdictions, it is held that in the absence
of a statute no amount of adverse holding of public muni-
cipal property will invest the claimant with the title in
opposition to the right of the municipality, but previous
to 1873, it had been written by this court, in many cases,
that a citizen might, by adverse possession, acquire a
good title to land that had been dedicated to and used
by the public. Rowan v. Portland, 8 B. Monroe, 232;
Dudley v. Frankfort, 12 B. Monroe 610; Alves v. Hener-
son, 16 B. Monroe 131; and it would appear that the
statute was enacted to avoid the effect of these decisions.

It is also a matter of common knowledge that many
towns and cities have an easement in land that is not
used or occupied by streets or alleys. For example, in
a great many towns and cities in the state, there are
wharves or public landings, the easement in which is in
the city or town. There are also, numbers of public
places, such as parks, in which cities and towns have an
easement that carries with it the right to use and enjoy,
although the title is in some other person.

But whatever the reason that influenced the legisla-
ture to use the word "easement," its meaning cannot be
extended to embrace lands to which the city or town has
a fee simple title without upsetting all recognized defini-
tions of the word "easement," and this we cannot do.
It is, perhaps, unfortunate that the legislature did not

employ some other word in place of "easement," or some other word or words in addition to the word "easement," but this is a matter over which we have no control.

It follows from what we have said that the statute has no application, and, as we have found that the Catholic church has held the land in dispute in such manner and for such length of time as to invest it with the title by adverse possession, the judgment must be and is affirmed.